**ACXIOM CORPORATION, a Delaware corporation, Plaintiff,**

v.

**AXIOM, INC., a Delaware corporation, Defendant.**

**No. CIV. A. 97–451–RRM.**

United States District Court,
D. Delaware.

Nov. 16, 1998.

Joanne Ceballos, Potter, Anderson & Corroon, Wilmington, DE, Chris R. Ottenweller, Orrick, Herrington & Sutcliffe, Menlo Park, CA, Michael B. Carlinsky, Orrick, Herrington & Sutcliffe, New York City, for Plaintiff.

David J. Margules, Todd C. Schiltz, Wolf, Block, Schorr & Solis–Cohen, Wilmington, DE, for Defendant.

## OPINION

McKELVIE, District Judge.

This is a trademark case. Plaintiff Acxiom Corporation is a Delaware corporation with its principal place of business in Conway, Arkansas. Defendant Axiom, Inc. is a Delaware corporation with its principal place of business in Moorestown, New Jersey.

On August 1, 1997, Plaintiff Acxiom filed a complaint, alleging that Defendant Axiom, by adopting the name, "Axiom, Inc.," is engaging in infringement of registered trademarks and service marks under § 32 of the Lanham Act, 15 U.S.C. § 1114; false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); dilution under the Federal Trademark Dilution Act of 1995, § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); unfair competition under Delaware's Uniform Deceptive Trade Practices Act, 6 Del. C. §§ 2531 *et seq.* (the "Deceptive Trade Practices Act"); and common-law trademark, service mark and trade name infringement. Acxiom seeks to cancel Axiom's registered trademarks and trade names and requests injunctive relief, award of Axiom's profits, reasonable attorneys' fees and costs. Defendant Axiom answered the complaint, denying liability on all of Acxiom's claims. The parties tried this matter to the court on February 17, 18, 19, and 20, 1998. This is the court's post-trial decision.

## I. FACTUAL BACKGROUND

The parties have fully briefed all issues before the court. The court draws the following facts from the parties' pleadings and evidence presented at trial.

### A. Plaintiff Acxiom Corporation

#### 1. General Background

Acxiom uses computer technology to provide information for business opportunities. Formerly known as CCX Network, Inc., Acxiom processes large-scale customer databases and provides information about consumers to businesses. The company traces it roots to the 1970s when several former IBM employees began processing and maintaining mailing lists for direct marketers. Acxiom became a public company in 1983 and has traded on the NASDAQ exchange under the ticker symbol "ACXM" since 1988. With offices in five countries and 3,000 full-time employees, Acxiom had revenues of $402 million in 1997.

Acxiom's data processing operation has grown to 16 mainframe computers processing up to 1.1 billion instructions per second and holding 350 terabytes of consumer data. This is a massive amount of data; one terabyte equals 1,000 gigabytes or the equivalent of 500 million pages of single-spaced text. In describing his company's work in his 1997 Chairman's Letter, Charles D. Morgan, Jr., Acxiom's chief executive, explained: "Simply put, [Acxiom] can take the massive amounts of information that a business collects about its customers, match names with lifestyles and demographic information from other sources, and give our client a clear picture of the people buying its products and services."

Acxiom began using "ACXIOM" as its business name and service mark on July 20, 1988. Rodger Kline, Acxiom's Chief Operating Officer, testified that the "C" in "ACXIOM" links its former name to the current name. Acxiom's Morgan testified in his deposition that setting the "CX" in a different color from the rest of the name gives it "a little bit of pizazz." The court notes that the company deliberately selected this unusual spelling for its new name. The company owns a number of trademarks and service marks incorporating "ACXIOM" which are registered with the Patent and Trademark Office ("PTO").

The PTO initially refused to register one of these marks, "ACXIOM MARKET-GUIDE," in 1994 because it "so resemble[d]" another mark, "AXIOM." This "AXIOM" mark referred to a single product name registered by Axis Computer Systems Inc. for use with "computer programs for materials resource planning and inventory planning for use in manufacturing, order processing and delivery fields." Following a June 26, 1995 *Amendment and Response* brief filed with the PTO, Acxiom overcame the Examiner's objections to this registration. Acxiom's actions regarding registration of its mark with the PTO are examined in greater detail in the Discussion section below.

### 2. *Acxiom's Business Interests*

#### a) *Primary Business*

Kline testified that Acxiom's "primary business is collecting, compiling, managing and providing data for marketing applications." To carry out this business, Acxiom provides various products and services for marketing databases, data warehouses and decision support systems for its customers. Businesses turn to Acxiom to augment and improve their own in-house data resources because they want to learn more about their existing and potential customers.

By way of background, the court notes that direct marketers, large companies with many end users, such as Allstate Corp., Prudential Insurance Co. of America, Conde Nast Publications and Marriott Vacation Club International and others, use Acxiom's data. Trans Union Corp., one of the nation's largest consumer credit agencies, uses Acxiom for all its data processing. Seventeen of the nation's twenty-five largest credit card issuers use Acxiom's products and services.

According to Kline's testimony, a marketing database is a collection of marketing information on a company's customers, including transaction data and other internal data that a company collects about its customers. This data can be combined with other data and made into a database to drive marketing activities, such as direct mailing. In this way, a company can target its marketing to its most receptive audience. As Kline explained, "[w]e regard our services as taking the junk out of junk mail by more closely aligning interests of people with the advertising material that they are going to receive. . . ."

A data warehouse is a more sophisticated database which includes information of greater breadth and greater depth than a standard marketing database. It typically includes information from more disparate sources and includes more transactional and historical information. A data warehouse can contain many millions of characters of information. Whether building a marketing database, data warehouse or a decision support system, Acxiom relies on its customer to collect data stored on its own internal systems, download the data and deliver it to Acxiom's Conway, Arkansas facility. There Acxiom uploads the data onto its computer mainframes, processes it and, in most cases,

adds its own data. Kline testified that the "key to most of the processes that [Acxiom] do[es] for customers [is] data integration," which refers to correlating and merging information from many disparate sources, eliminating duplicative and irrelevant data, correcting incomplete and inaccurate information, standardizing formats and, as appropriate, adding Acxiom data into a marketing database, data warehouse or decision support system.

For example, Acxiom's InfoBase is a "multi-sourced consumer data file" offering "demographic, socioeconomic and psychographic data on households and individuals." By way of background, a 1997 *Forbes* article claims InfoBase contains "some or all of the following information on 195 million Americans: age, estimated income, home ownership, cars owned, occupation, children, education, buying habits," among others. In 1996, Acxiom used InfoBase to enhance marketing lists totaling 3.7 billion names. Another example of Acxiom's services is its DataQuick List Services which, according to Acxiom's promotional literature, offers real property data for over 67 million properties. Mortgage lenders and insurance underwriters use DataQuick to assess business risks.

### b) *Telecommunications Business*

#### i) *Telecommunications Business Unit*

James Drake, Acxiom's former Telecommunications Business Leader, testified that Acxiom formed its Telecommunications Business Unit in 1993 in anticipation of deregulation of the telephone industry. In fiscal year 1997, the unit had a staff of about thirty people and $7.0 million in revenues. Through this unit, Acxiom sells its products and services to customers within the telecommunications industry. Drake testified that the unit's sales representatives frequently cold call potential customers introduce themselves. According to Drake, Acxiom's current and potential customers within this industry include regional Bell operating companies; long distance providers; competitive local exchange companies; independent local exchange companies, like GTE; cellular companies; pager companies; cable television companies; and satellite companies.

Acxiom has built marketing databases for telecommunications companies such as Ameritech, Bell Atlantic, Bell South and GTE. In building these marketing databases, Acxiom worked on external data as well as internal data such as data from the company's billing system, customer care department and other departments.

Billing system data is sourced from call detail records, or "CDRs." At trial, witnesses offered different technical definitions of CDRs. For example, Richard Kraus, Defendant Axiom's Vice President of National Sales, testified that a CDR is a Bell AMA format record that contains many fields of information pertaining to a telephone call. Bell AMA format refers to generic requirements established in 1994 for the Automatic Message Accounting Data Networking System. According to Kraus, the CDR includes the originating telephone number, the terminating telephone number, the time of day, the duration of the telephone call and the identity of the switch from which the telephone call came. In all, up to 256 different fields can constitute the CDR.

Acxiom's Drake defined a CDR as "a record of transaction of every call that is made that is collected by a particular switch." To Drake, CDRs are synonymous with transaction data which has marketing potential for a telecommunications company: "Every time a person picks up a receiver, a record is created on the switch that tells information like the originating number, the destination of the call, how long the call lasts." To underscore the CDR's value, Drake noted the CDR "has been referred to as the Holy Grail" because it contains information that is "critical" for the telecommunications companies to "understand their customers better." For example, a telephone company can discern a pattern of telephone usage based on its review of CDR data that indicates a customer uses his computer to access the Internet. The company can then market a tailored Internet service promotion to that customer.

#### ii) *Ameritech Project*

At trial, Drake testified that Acxiom is "currently in the process right now of doing

call detail processing with Ameritech," a telecommunications company, however Ameritech and Acxiom have not yet come to any financial arrangement for this project. Moreover, there is no contract and no agreement between Acxiom and Ameritech at this time. According to Drake, this project "involves taking [Ameritech's] call detail record transactional data and aggregating it, summarizing it so they can use it to make decisions better. It will involve some filtering of the data and reformatting it." Acxiom, however, processes these CDRs without adding data to them. Steve Lahodny, an Acxiom Telecommunications Business Unit sales associate assigned to the Ameritech account, testified that Ameritech has sent the first data file to Acxiom. Acxiom will take this data, and using Ameritech's specifications, develop a processing document. Lahodny testified that Acxiom has the ability to create software for the processing of CDR data. In addition to Ameritech, he has discussed Acxiom's interest in processing CDR data with two other telecommunications companies, Alltel & GTE. Acxiom is determining whether it can do the job to Ameritech's satisfaction. According to Drake, the Ameritech project is Acxiom's only project involving the processing of CDRs.

In his January 21, 1998 deposition offered at trial, John Hershberger, Ameritech's Director of Database Management, testified that he provides analytical and support services for his company's extensive marketing operations. He testified that Ameritech is considering working with Acxiom on a project involving transaction data processing but confirmed that no final decision has been made; it is a "test of a concept." He discussed using transaction data to facilitate decision support services with Acxiom's Drake, Lahodny and two other representatives in late May or June 1997 and "on a couple more occasions." Hershberger testified that in his view, Acxiom is interested in developing products to derive marketing, customer profiling and fraud management value from transaction data.

Specifically, he wants Acxiom to do "smash invector" work on Ameritech's Consumer Usage Tracking System, or "CUTS," data. Ac-

cording to Hershberger, CUTS data is data that has already flowed from the switch through a software called CAMPS. CAMPS formats switch-level data so that it can be read by Ameritech's usage, tracking, and billing systems. From CAMPS, the data flows to CUTS. CUTS data contains information about all the transactions made on a particular account telephone number (ATN) such as originating number, terminating number, duration of call and distance of call. Hershberger testified that the term, "smash invector," refers to taking many sequential telephone call transactions that have been recorded and smashing them down into more manageable data. Telephone calls are recorded as made; each individual call becomes a row of data. Hershberger wants Acxiom to smash down the many rows of transaction data into only one row containing usable data summarized according to Hershberger's specifications. This one row will provide information about telephone usage such as what times a customer calls and what types of long distance calls the customer makes. This information can be used to discern a pattern of customer calling behavior, which has marketing potential.

A one row record in binary form saves Ameritech time and money because it is cheaper and less time consuming than Ameritech's processing multiple records. Hershberger views CUTS, transaction data and CDR data as synonymous. Ameritech lacks the physical capacity to do the many aggregations and summarizations required to do smash invector work and does not want to invest in the necessary infrastructure to do it on its own. Thus, the project calls for Acxiom to summarize the data, reformat it pursuant to user-defined format, segment it and aggregate it.

Defendant Axiom's Kraus testified regarding his understanding of Acxiom's project with Ameritech. According to Kraus, Acxiom is working with Ameritech to analyze and use CDR data. Kraus testified that before CDRs go to Acxiom, they run through several processes. First, CDRs, in Bell AMA format record, go to a data center where "front end processes" are run by a group called "EBAC." These processes in-

clude functions performed on the data, such as auditing and verifying. The CDR data then goes to CAMPS where the Bell AMA format record of 80 to 100 bytes is turned into an Extended Message Record, or EMR, of 250 bytes. The data then goes to CUTS and from there to Acxiom. Kraus testified that Axiom sells no product that adds or deletes data from a CDR.

### c) *Name Recognition and Advertising*

Acxiom's Chief Operating Officer Kline testified that Acxiom spent over $25 million to promote the company over the past two years and $50—60 million over the last eight to ten years. In 1997, for example, Acxiom spent over $700,000 on magazine advertising. Acxiom publishes *Case–in–Point* newsletter and maintains a web site. Scott Terry, Acxiom's Marketing Leader for Corporate Marketing since July 1997, testified that the majority of marketing efforts are to build and increase awareness and to shape Acxiom's image.

Terry testified that in 1997, newspaper and Internet coverage of Acxiom resulted in 2,000 "hits," meaning that Acxiom was at least mentioned in a publication. National magazine coverage of Acxiom resulted in 250 "hits." Acxiom also had one major television promotion in a segment on "Business Review" hosted by Casper Weinberger. Through its partnership with *CIO* Magazine, Acxiom targets " IT or information technology and business executives who control the direction of purchasing and long-range strategic plans within their enterprise," according to Terry.

Acxiom has received special recognition. For example, the Direct Marketing Association honored Acxiom for its state of the art technology; *Financial World* named it one of its "Best Growth Companies" in 1997; and the *Wall Street Journal* recognized it as one of 38 companies "deserv[ing] special congratulations" as a financial performer. Kline testified that Acxiom is "very well known in our field, in marketing databases, and market-oriented data warehouses" citing, among others, recognition from ATT and Allstate, two of Acxiom's "major customers."

### B. *Defendant Axiom Inc.*

#### 1. *General Background*

Axiom uses computer technology to capture information, in the form of CDRs, from the switches of telecommunications companies. Andrew Maunder, Axiom's President and Chief Executive Officer, testified that Axiom "provide[s] product that collects CDR[s] from switch and can provide it into potentially any area of a telephone company." According to its 1997 prospectus for its initial public offering, Axiom "develops, markets and supports integrated hardware and software systems" which "collect and process an increasing volume of transaction information from a wide variety of wireline switches . . . ." These systems then transmit "the information to the customer's information management networks . . . customers use this information to bill their subscribers, to implement customized marketing programs and to perform other data management functions."

Axiom traces its origins to Telesciences, Inc., a corporation formed in 1967. The multinational corporation Securicor purchased Telesciences, Inc. in 1994 and renamed it Securicor Telesciences, Inc. The company had revenues of almost $34 million for the year ended September 30, 1996. Axiom adopted its current business name, "Axiom," on May 22, 1997. Axiom's stock has publicly traded on the NASDAQ exchange under the ticker symbol "AXIM" since July 1997.

In addition to using "AXIOM" as a business name, Axiom filed an application in May 1997 with the PTO to register "AXIOM" as a trademark and service mark. Axiom has no other registered Axiom trademarks. In choosing its current name in 1997, Axiom undertook a process by which it considered various names with similar conceptual qualities. Amy Gooen, a business communications analyst described as a "creative consultant" by Axiom's Morrow, testified in her deposition that she was hired to come up with new names for the corporation. Gooen testified she received input from senior executives Farina and Morrow, explaining that Farina wanted a one word, English language name that was not an invented name. Gooen testi-

fied she used a dictionary, thesaurus and word origin reference book to come up with appropriate name options which she submitted to Morrow. Company executives rejected one name among the options, "Radix," because another company already had a similar name.

Axiom used the Wolf, Block, Schorr and Solis–Cohen LLP law firm to evaluate whether it could register the "AXIOM" mark. In his deposition, Robert Zielinski, the attorney responsible for the evaluation, testified that he reviewed Axiom's marketing materials, conducted name searches and personally reviewed the search results. Zielinski testified that he noted Acxiom's registrations but concluded that they did not pose a legal obstacle. He also testified that as part of his legal work related to the mark, he held discussions with Axiom senior executives Maunder and Morrow.

### 2. Axiom's Business Interests

#### a) Primary Business

According to its 1997 prospectus, Axiom "provid[es] comprehensive billing data collection solutions to the telecommunications industry." Specifically, Axiom focuses on CDRs. In his testimony, Kraus, Axiom's Vice President of National Sales, explained how Axiom currently uses CDRs to capture data: Axiom attaches a piece of its equipment, known as a Sterling 500, to a telecommunications company's switch. The Sterling 500 collects CDR data, in Bell AMA format record, from hundreds of different switches. Next, Axiom's host collector, known as the Sterling 5000, collects CDRs from the Sterling 500s. The Sterling 5000 then sends this data to a telephone company's operating systems, such as a billing system or an accounting department. In essence, Sterling 500s pull CDR data from switches and feed that data into Sterling 5000s. Sterling 5000s then feed the accumulated data into a company's operating systems. Axiom also sells "traffic management systems," known by the names Manifest and Sterling Manager, to monitor switches and Axiom equipment. Axiom will soon be selling the Sterling 7000 which transmits CDR copies to a company's fraud management system. According to its 1997 pro-

spectus, Axiom also "is developing systems that process transaction information from ... other specialized telecommunications switches," such as wireless and ATM, or asynchronous transfer mode, switches.

Axiom's equipment handles millions of telephone calls per hour; in some cases, over 200 million calls per day in near real time. The term, "data mediation," refers to this process of collecting data from a switch and passing that data to an application. Data mediation embraces everything that happens between the switch and the operating systems of a telecommunications company.

Axiom's equipment can normalize CDR data to standard format in several ways. For example, Axiom's equipment can reformat a non-AMA format record into AMA format. Axiom's validation module can identify and flag incomplete or incorrect CDRs. Axiom's filtering special processing module can identify and flag CDRs targeted for a billing system at a different location. Axiom's correlation special processing module can identify and capture multiple related records of the same call; for example, the same telephone call could involve several different switches. Moreover, Axiom is developing validation and correlation processes. Andrew Maunder, Axiom's President and CEO, testified that the core competence of Axiom, "was very much switch interface technology."

Michael S. Farina, Axiom's Vice President of Marketing and Sales, testified that Axiom's customer base is composed of wireline companies, local exchange carriers and long distance carriers. In his testimony, Kraus identified Axiom's current and potential customers in the United States and Canada to include "around twenty telecommunications companies," including the regional Bell operating companies, GTE, ATT Communications, MCI and several smaller independent telephone companies such as Puerto Rico Telephone Co. According to Axiom's 1997 prospectus for its initial public offering, in fiscal year 1996, three regional Bell operating companies, U.S. West, Inc., Southwestern Bell Telephone Company, and Ameritech Corporation, were the company's largest customers for billing data collection systems.

These three companies represented approximately 61.6% of Axiom's total revenues.

### b) *Name Recognition and Advertising*

Axiom markets itself in several ways. Kraus testified that members of his sales force make cold calls to introduce themselves to customers. Axiom advertises in billing and telecommunications publications; it exhibits products at industry trade shows; and its company personnel speak at industry events and write articles for trade publications. Axiom also has a web site on the Internet.

Axiom claims these media share a common target in that they are all directed to phone company billing and network professionals. Jef Morrow, Axiom's Director of Corporate and Product Marketing, testified that Axiom has a "very limited advertising budget," and does not direct promotional materials to marketing, finance and senior management personnel of telecommunications companies "[b]ecause they're not our customers." Morrow testified that "[t]he transaction data that [Axiom] provide[s], that [Axiom] deliver[s] to various functions, cannot by itself be used as a marketing tool, as a marketing support system. It's a raw input. It's not the process itself."

### C. *Allegations of Confusion*

Acxiom alleges that from Defendant's initial use of the "AXIOM" name in June 1997 until the close of discovery in January 1998, "there were at least nine reported instances brought to Plaintiff's attention in which a knowledgeable person confused Defendant with Plaintiff." According to Acxiom, those persons allegedly experiencing confusion included a writer for a telecommunications publication, two business service vendors to Acxiom, an Acxiom sales associates, a businessman, an Acxiom customer, two investors and a potential investor.

In his deposition, Matthew Vartabedian, technology editor of *Telemarketing & Call Center Solutions* magazine, testified that he incorrectly used Acxiom's name in place of Axiom's name in a "blurb" he prepared for his magazine's "People" column in the November 1997 edition. The blurb read: "ACXIOM Inc., a supplier of real time, billing, data collection and processing, data analysis and reporting and fraud management systems to telecommunications providers has announced that its President and CEO, Andrew Maunder, has been appointed to the additional position of Chairman of the company." Vartabedian, who characterized his job at the magazine as an entry-level position, testified that he made a "mistake." When he saw Axiom's press release announcing the Maunder appointment, he "just misidentified the company involved and wrote it as 'Acxiom.'" Vartabedian said he also thought of Acxiom when he read the phrase, "data collection," in Axiom's press release.

Acxiom presented deposition testimony from two business services vendors, Sondra Kurtin, chief executive officer of Robinson–Kurtin Communications and Cynthia Liesenfeld, systems manager of Robinson–Kurtin Communications, regarding another alleged incident of confusion. Kurtin testified that Robinson–Kurtin Communications is a seven person company that designs and writes annual reports for Fortune 500 and Mid–Cap companies, including Acxiom. Liesenfeld testified that in October 1997, while at work, she printed out an article from the Dow Jones headlines reporting a "stock price plunge" for "Axiom." She stated that she was confused because she thought this was a reference to Acxiom " because of the name and the description of what the company did." Liesenfeld told Kurtin and gave her a copy of the article. Thinking the article referred to Acxiom and as she was concerned about the stock price plunge, Kurtin announced the plunge on the office intercom and employees came into her office. Kurtin then telephoned Nancy Greibel, her contact at Acxiom. Some fifteen to twenty minutes later, "James," a Robinson–Kurtin Communications employee, told Kurtin that the article used the wrong stock ticker symbol for Plaintiff. When asked by Axiom's counsel on cross-examination whether she believes Acxiom's mark looks like Axiom's mark, Liesenfeld responded, "... I know that the type font doesn't look the same, but when you look at the name, it looks like the same name. Stylistically, there [are] differences,

but as a quick glance of the name, to me, they look like the same name."

Lahodny, Acxiom's sales associate, testified that while attending the "Supercomm" trade show in June 1997, he "saw several people that I knew personally that were what I would say are our potential future customers." He testified that he saw Axiom's trade show booth and had the "impression" that it "was probably an international organization of Plaintiff Acxiom." On cross examination, he testified he "really didn't know" if it was affiliated with Acxiom but "suspected it could be." He does not remember giving his business card to anyone at Axiom's booth or discussing joint ventures with David Lamb, an Axiom employee at the booth.

George Anderson, Regional Director for Business Development of the Amdahl Corporation, testified that on about October 20, 1997, he learned Acxiom had a demographic database of possible interest to his company and he was given Steve Lahodny's name and telephone number. He knew very little about Acxiom and did not know how Acxiom spelled its name. Before speaking with Lahodny, he attended the "NCF '97 Infovision" trade show in Chicago where he saw a woman wearing an Axiom badge. He asked her if she was from Conway, Arkansas. She told him, "That's not us." During a telephone call that same day, he mistakenly told Lahodny that "Acxiom" was at the trade show in Chicago and asked Lahodny if he would attend. Lahodny said Acxiom was not there and explained Axiom was. Anderson testified that other people "would likely be confused" by the two companies' names. He specifically cited "[p]eople that may be new to the industry ... people that maybe don't have the exposure to the different providers of products in the industry" and gave as examples university students and others, like himself, who have been "focused on one account for the last ten years and not really seeing what else is out [ ] there."

Carolyn Boyles, a Southwestern Bell Wireless manager, testified that she thought Axiom was Acxiom based on her reading of an article in *Cellular Business* magazine. The article mentioned "data collection solutions" which to her was "what [Acxiom] did as its business" and discussed "telecommunications providers" with whom she knew Acxiom had "relationships." She thought that text in an Axiom advertisement "could relate to the Plaintiff" specifically the phrase, "[t]he real time billing data collection and revenue assurance, transforming diverse transactions into a stream of profitable data."

Two Acxiom investors, Brian Lancaster and Phillip Pascoe, and a potential investor, Thomas Ross, gave deposition testimony concerning incidents of confusion. Lancaster testified that in October 1997, he saw a televised *Nightly Business Report* which mistakenly reported that Acxiom's stock price declined when, in fact, Axiom's stock price had declined. After an hour of researching and "agonizing," he realized the mistake. He testified he was "close" to selling the stock and he called Acxiom the next day to confirm the mistake.

Pascoe testified that in early October 1997, he heard CNNFN's "Stock To Watch" program announce that Acxiom had suffered a shortfall in earnings. In fact, Axiom had suffered a shortfall in earnings. Later that morning, "as soon as time would allow," he telephoned his son, an Acxiom employee, to "get some clarification" and to assure himself that this was a different company.

Ross, an Arkansas resident, testified that on October 9, 1997, while he watched CNBC, he heard a reporter announce that Axiom stock had dropped 40%. The reporter described Axiom as "a computer hardware and software company." Ross, who did not know how Acxiom spelled its name at the time he watched this CNBC broadcast, "was very sure and very certain" that Acxiom's stock dropped. The next morning, he checked the *Arkansas Democrat Gazette* for a story explaining the drop, but he did not find anything. He checked the listed stock prices in the newspaper, saw the other Axiom and realized his mistake.

D. *Expert Testimony on Alleged Confusion*

Several expert witnesses testified regarding confusion. Acxiom's expert witness George John, a Professor of Marketing at the

University of Minnesota, testified that brand names are "very important in establishing credibility" for business to business sales situations. Brand names help a company get its "foot in the door" and in this regard, a company's reputation is a "critical asset." According to John, "there is overlap in what these companies [Acxiom and Axiom] tell their clients, prospective clients, what you can do with our products. You can use our products to gather, process and utilize data to do better marketing. That's where [ ] the principal overlap is." John testified that the "buying centers" also overlap for Acxiom and Axiom. The phrase, "buying centers," refers to the set of people and the activities these people engage in during the process of buying a product or service. John testified that the buying centers for the telecommunications customers of Acxiom and Axiom include information technologists, marketing and sales specialists and operations personnel. These participants are knowledgeable in their specialized field but tend to rely on their buying center counterparts for information outside their own area of expertise.

John testified that a company's distinctiveness, defined as freedom from confusion, is important with respect to the buying centers because a participant in the buying center communicates information by word of mouth to other buying center participants. A company's information gets carried to these other participants and any confusion among companies makes the task harder. John defined confusion in this context as "hav[ing] a belief about a particular object and that belief is attributed wrongly to another object." According to John, in this example of confusion, the company with the stronger reputation, like Acxiom, has more to lose because a company with the lesser reputation, like Axiom, is mistakenly associated with Acxiom and derives benefit from Acxiom's stronger reputation. Similarly, if Axiom were to introduce a product that suffers from adverse customer perceptions, any confusion between the brand names occurring in a word-of-mouth process among buying center participants would hurt Acxiom's reputation.

During cross examination, John testified he did not consider the reputation of Axiom's former company name, Securicor Telesciences, and whether any of that reputation merged into the Axiom name when it was established in 1997. John testified he did not realize that Axiom had greater revenues in telecommunications sales than Acxiom. He testified he is not a telecommunications industry expert, that he did not do any quantitative analysis for his expert report, and that the only person he interviewed in depth for the report was Acxiom's Drake.

Acxiom's expert witness Orest E. Bliss, the head of Bliss Associates, Inc. and a former managing director of Paine Webber, testified on investor confusion. According to Bliss, Acxiom and Axiom share similarities; both companies are incorporated in Delaware, have similar businesses, trade on the NASDAQ stock exchange, and share identical pronunciation of their spoken names. Bliss testified that investors rely in large part on information communicated orally in the form of person to person communication, financial information services and other media. He testified that "[a]s a result of the phonetic and graphic similarity of the corporate names and [stock] ticker symbols, the two companies have created a situation that there's a likelihood of confusion, mistake or error in the securities industry marketplace."

Axiom's expert witness Stephen Hoch, a Professor of Marketing at the University of Pennsylvania's Wharton School, testified that the likelihood of confusion between Acxiom and Axiom is low. According to Hoch, the more two things are similar, the more they are confusable. In this case, confusion is a function of shared versus unique features of Acxiom and Axiom. Hoch testified that each company consists of features including things like the company's name, customers, marketing activities and products. He examined features that comprise Acxiom and Axiom, noting similarities and differences.

Hoch testified that while the companies' names sound the same, the companies' use of the name for products is different. Axiom does not use its company name for specific products while Acxiom does. According to Hoch, the companies' business customers are "quite different." Acxiom sells to many different firms whereas four

telecommunications firms make up the bulk of Axiom's business. While Acxiom and Axiom sell to telecommunications firms, they satisfy different needs within the industry. Hoch testified that the companies' products are different; Acxiom engages in activities like database management and direct marketing activities, whereas Axiom's product is "a kind of billing funnel that collects the CDRs from all different switches that the telecommunications company has out in the field." Hoch testified that Acxiom and Axiom are involved in "inherently different types of information processing."

According to Hoch, Axiom has only three large customers. Hoch testified that in general, Acxiom sells mainly to a company's marketing and information technology staff who have more of a business background while Axiom sells to a company's operations and accounting staff who have more of a technical background. Hoch testified that staff involved in purchasing from either company will "engage in a very symptomatic, prolonged search" which further reduces the likelihood of confusion because they will realize these are two different companies. Acxiom and Axiom do not share competitors. According to Hoch, the type of sale is different; Axiom "has a very long technical sale[s] [period]" ranging from one or two years whereas Acxiom "has a more standard, shorter type of sale[s] period." The companies advertise in different types of vehicles.

During cross examination, Hoch testified that he did not weigh any companies' features in his examination. He testified he "essentially took ideas, analogies, statements, out of a research assistant's memorandum and incorporated them in" his report, although "he looked at the materials" and personally reviewed about "six inches" worth of materials.

Axiom's expert witness, Edward T. Borer, Chairman of Philadelphia Corporation for Investment Services, testified that "name similarities do not result in ultimate confusion in the securities markets when it comes to trading activity." Borer testified that securities markets are heavily regulated industries; regulators closely monitor trading. According-

ing to Borer, if regulators had discovered any meaningful confusion between similarly-named companies, they would have regulations in place. Borer testified that while there can be "initial confusion" between two similarly-named companies, investors check information before they trade on it; brokers are "on the hot seat to do the right thing [by] execut[ing] the correct trade for the customer," and orders are entered into written system where the ticker symbol is entered into the computer. Borer testified that he knows of no actual mistaken trading with respect to Acxiom and Axiom.

During cross-examination, Borer testified he has not expressed an opinion as to whether there is a likelihood of confusion between Acxiom and Axiom, he has only provided an opinion as to whether name similarity for publicly-traded companies presents a significant problem. Borer testified that aside from reading NASD notices to members, he did not research any other publicly available news reports on confusion.

## II. DISCUSSION

### A. The Law of Trademark

■ "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir.1994) (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983) (hereinafter "*Lapp*")). *See Ford Motor Co. v. Summit Motor Products*, Inc ., 930 F.2d 277, 291–93 (3d Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228–29 (3d Cir.1978). *See also* Lanham Act § 32, 15 U.S.C. § 1114(*l* ) (infringement of federally registered trademarks is determined by test of whether defendant's use is "likely to cause confusion, or to cause mistake, or to deceive").

■ To prove trademark infringement, the plaintiff must prove three elements:

(1) The mark is owned by the plaintiff;

(2) The mark is valid and legally protectable; and

(3) The defendant's use of the mark to identify products or services is likely to create confusion concerning the origin of the products or services.

*Fisons,* 30 F.3d at 472 (citing *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990)).

### 1. *Is the mark owned by the plaintiff?*

With regard to the first element, Acxiom contends it is the owner of the various Acxiom marks at issue in this case. These marks, registered with the PTO, include: "ACXIOM," "ACXIOM TARGETQUEST," "ACXIOM ACXESS," "ACXIOM MARKETSCORE," "ACXIOM MARKETREADY," "ACXIOM MARKETSELECT," "ACXIOM MARKETTRANSFER," "ACXIOM MARKETIMAGE" and "ACXIOM CHANGE PLUS." Acxiom also has several applications for registration of marks pending before the PTO. Axiom does not challenge Acxiom's ownership of these marks and admits to Acxiom's ownership of these marks in the joint pre-trial order. The court finds that Acxiom is the owner of the marks at issue. Thus, Acxiom satisfies this first element.

### 2. *Is the mark valid and legally protectable?*

■ The second element, a mark's validity and legal protectability, is met by proving a mark was federally registered and has become "incontestable" under the Lanham Act, 15 U.S.C. §§ 1058 and 1065. *See Fisons,* 30 F.3d at 472 (citing *Opticians Ass'n,* 920 F.2d at 194). In the joint pre-trial order, Acxiom contends the marks at issue are valid and legally protectable. In the joint pre-trial order, Axiom contests the validity of the marks at issue, contending Acxiom committed fraud on the PTO when it registered the marks.

■ The Lanham Act provides that an incontestable mark is subject to eight defenses. *See* 15 U.S.C. § 1115(b). If a defendant can prove any one of these defenses, which include fraud, *see* 15 U.S.C. § 1115(b)(1), and estoppel, *see* 15 U.S.C. § 1115(b)(8), then plaintiff loses the presumptions of validity, ownership and right to protection. *See Ford*

*Motor Co.,* 930 F.2d at 291; *First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc.,* 896 F.Supp. 456, 459 (E.D.Pa.1995).

To prove that Acxiom committed fraud on the PTO, Axiom must establish, by clear and convincing evidence, the following five elements:

(1) False representation regarding a material fact;

(2) Knowledge or belief that the representation was false, or *scienter;*

(3) Intention to induce the listener to act or refrain from acting in reliance upon the misrepresentation;

(4) Reasonable reliance upon the misrepresentation; and

(5) Damage proximately resulting from such reliance.

*See Guardian Life Ins. Co. of America v. American Guardian Life Assur. Co.,* 943 F.Supp. 509, 529 (E.D.Pa.1996) (citations omitted).

■ As a defense under the Lanham Act, 15 U.S.C. § 1115(b), Axiom contends Acxiom committed fraud on the PTO and therefore loses the presumptions of validity and right to protection. Specifically, Axiom asserts Acxiom committed fraud on the PTO because Acxiom dismissed the possibility of confusion among Acxiom's own products and services and products and services using other "AXIOM" names in Acxiom's *Amendment and Response* brief filed with the PTO, discussed in the Factual Background section above. To support its case, Axiom cites an Eighth Circuit Court of Appeals case, *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863 (8th Cir.1994). The *Aromatique* case, however, makes it plain that "to show that an applicant defrauded the PTO the party seeking to invalidate a mark must show that the applicant intended to mislead the PTO." *Id.* at 877–78. Here, the court finds Axiom has made no such *scienter* showing. Moreover, the court finds Axiom has not shown Acxiom made false statements regarding a material fact to the PTO. Thus, the court finds Axiom has not established, by clear and convincing evidence, the required five elements of fraud defense.

■ Based on the same facts alleged for its fraud defense, Axiom further contends Acxiom is estopped from arguing that likelihood of confusion exists, or from asserting any factual or legal argument inconsistent with positions taken in Acxiom's submissions to the PTO related to registration of its marks. Axiom contends that estoppel applies because Acxiom's PTO brief dismissed the possibility of confusion among Acxiom's own products and services and computer products using other "Axiom" names. To support its contentions, Axiom cites a Northern District of Illinois case, *Lampi Corp. v. American Power Prods., Inc.*, C.A. No. 93–C–1225, 1995 WL 723764 (N.D. Ill. Dec. 5, 1995). In *Lampi*, two companies, Lampi and American Power Products ("APP"), manufactured fluorescent lighting products. Lampi submitted photographs of APP's Mini–Fluorescent lamp to the PTO to demonstrate that the its own Micro Lampi design was distinct from other lamps and, therefore, not purely functional. *Id.* at *1–*2. After obtaining trademark rights by demonstrating that the Micro Lampi was distinct from APP's Mini–Fluorescent, Lampi soon brought a trademark infringement action against APP, contending that APP's Mini–Fluorescent was confusingly and deceptively similar to Lampi's Micro Lampi. *Id.* at *4–*5.

In Acxiom's PTO action, the cited mark was "AXIOM," the name for a single product registered by Axis Computer Systems, Inc. for computer programs for inventory and materials resource planning in the manufacturing, order processing and delivery fields. The court notes that in *Lampi*, the trademark owner obtained protection for the mark by distinguishing his product from the other mark's product. Once it obtained the mark, the owner reversed positions and argued the other mark was confusingly similar to his own. In this case, Acxiom distinguished a same or similar mark, but by arguing it was being used for a different product that would not be confusing. That argument is not inconsistent with the position it is taking in this case. As the Third Circuit Court of Appeals has explained, likelihood of confusion can only be addressed based on the particular facts of each situation. *See Fisons*, 30 F.3d at 476, n. 11. Accordingly, the court finds

Acxiom's position in the PTO action is not inconsistent with its position in the present case because, unlike the plaintiff in *Lampi*, Acxiom has not been inconsistent in its arguments over the mark. Thus, the court finds Axiom has failed to establish an estoppel defense.

3. *Is the defendant's use of the mark to identify products or services likely to create confusion concerning the origin of the products or services?*

■ The Third Circuit has explained that the third element, likelihood of confusion, exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Fisons*, 30 F.3d at 472 (citing *Dranoff–Perlstein Assoc. v. Sklar*, 967 F.2d 852, 862 (3d Cir.1992) (internal quotations omitted)). A plaintiff's showing of proof for the third element depends on whether the products or services offered by the trademark owner and the alleged infringer are in competition. If plaintiff and defendant deal in competing products or services, "the court need rarely look beyond the mark itself." *Id.* at 472(citing *Lapp*, 721 F.2d at 462 (further citations omitted)). For competing products or services, the court focuses on the marks to determine whether they are "confusingly similar." *Id.* at 473 (citing *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1063 (3d Cir. 1991)). However, where the products or services are not competing, the similarity of the marks is only one of the factors the court must examine to determine likelihood of confusion.

a) *Are Acxiom's products and services in competition with Axiom's?*

■ Acxiom contends that its products and services are in competition with Axiom's "because the parties offer competing products and services for the processing of Call Detail Record (CDR) data for non-billing applications." Axiom contends that its products and services are not in competition with Acxiom's. In determining whether plaintiff's and defendant's products and services are in

competition, courts examine whether the products and services can be substituted or interchanged for one another. *See Safeguard Bus. Systems Inc. v. New England Bus. Systems, Inc.*, 696 F.Supp. 1041, 1044 (E.D.Pa.1988).

The court finds the Ameritech project demonstrates Acxiom's current movement toward products and services involving call usage data and CDRs. Hershberger, Ameritech's Director of Database Management, testified that Ameritech is considering working with Acxiom on a project involving transaction data processing. He testified, however, that no final decision has yet been made, describing it is as a "test of a concept." Hershberger testified that he wants Ameritech to do "smash invector" work on Ameritech's CUTS data. Hershberger and Axiom's Kraus testified that before CDRs go to Acxiom, they run through several processes; thus Acxiom, unlike Axiom, does not work on raw, or unprocessed CDRs. Acxiom's Drake and other witnesses testified that Ameritech and Acxiom have not yet come to any financial arrangement for this project and have not yet entered into a contract or any kind of agreement.

The court finds the facts show that the Ameritech project is, as Hershberger described, a "test of a concept," particularly since Acxiom and Ameritech have not yet entered any kind of agreement and no money has changed hands. Thus, the court concludes that the Acxiom's and Axiom's products and services are not in competition.

### b) *The Third Circuit's ten Lapp factors.*

Where plaintiff and defendant deal in non-competing products or services, as is the case here, the Third Circuit has held that "the court must look beyond the trademark to the nature of the products or services, and to the context in which they are marketed and sold. The closer the relationship between the products or services, and the more similar their sales contexts, the greater the likelihood of confusion." *Lapp*, 721 F.2d at 462 (citations omitted).

Likelihood of confusion is also the test for actions brought under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), for unfair competition to prevent false representations as to the source or origin of products or services by a mark confusingly similar to one already in use. *Fisons*, 30 F.3d at 473; *see, e.g., Sun–Fun Products, Inc. v. Suntan Research & Development Inc.*, 656 F.2d 186, 192 (5th Cir.1981) (finding factors relevant to unfair competition claim under 15 U.S.C. § 1125 "essentially the same" as those factors relevant to trademark infringement claim under 15 U.S.C. § 1114). As the U.S. Supreme Court has commented in an historical context, "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989).

■ The Third Circuit applies a ten factor test to determine likelihood of confusion in cases of trademark infringement and unfair competition involving non-competing products or services. *Fisons*, 30 F.3d at 473 (citing *Dranoff–Perlstein*, 967 F.2d at 862–63; *Ford Motor Co.*, 930 F.2d at 293; *Lapp*, 721 F.2d at 463; *Scott Paper*, 589 F.2d at 1229). These ten factors, known as the *Lapp* factors, or the *Scott Paper* factors, include:

(1) The degree of similarity between the owner's trademark and the alleged infringing mark;

(2) The strength of the owner's mark;

(3) The price of the products or services and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) The length of time defendant has used the mark without evidence of actual confusion arising;

(5) Defendant's intent in adopting the mark;

(6) Evidence of actual confusion;

(7) Whether the products or services, though not competing, are marketed through the same channels of trade and advertised in the same media;

(8) The extent to which targets of the parties' sales efforts are the same;

(9) The relationship of the products or services in the minds of consumers because of the similarity of function; and

(10) Other facts suggesting that the consuming public might expect the prior owner to manufacture a product or provide a service in the defendant's market, or that he is likely to expand into that market.

See *Fisons*, 30 F.3d at 473; *Lapp*, 721 F.2d at 463; *Scott Paper*, 589 F.2d at 1229.

In *Lapp*, the Third Circuit applied these ten factors to find trademark infringement where two corporations used the same trademark on non-competing products. As *Lapp* is a landmark Third Circuit case important for its trademark infringement teachings, the court reviews it in detail. The Lapp Division of plaintiff Interpace Corporation ("Lapp–Interpace") manufactured and sold ceramic insulators under the "Lapp" trademark. The trademark was registered in 1953. Defendant, Lapp, Inc., the U.S. marketing arm of a German corporation, had distributed wire, cable and related electrical products in the U.S. under the names "Lapp" and "Lapp Cable" since 1977 but had never applied for federal registration of its mark. Lapp–Interpace sued under the Lanham Act to enjoin Lapp, Inc., from using the "Lapp" name on its products. The district court dismissed the complaint based on its interpretation of *Scott Paper*. The Third Circuit reversed, holding that *Scott Paper* mandated judgment for plaintiff. *Lapp*, 721 F.2d at 462.

In *Lapp*, the district court made factual findings in every relevant area of inquiry, however, it did not formally apply the factors enumerated in *Scott Paper*. *Id.* at 463. On appeal, the Third Circuit applied the *Scott Paper* factors to the facts of the case and determined these factors weighed in plaintiff's favor. Specifically, the Third Circuit found that the names "Lapp" and "Lapp Cable" as used on the respective products were similar (*Lapp* factor (1)); the "Lapp" mark had strength based on its distinctiveness and fifty years of continuous use (*Lapp* factors (2) and (4)); customers experienced confusion (*Lapp* factor (6)); and both companies used similar methods of sale and advertisements in the same media (*Lapp* factor (7)).

The Third Circuit further found that although the products were not directed to the same customers, a prospect of overlap in the potential customer pool existed (*Lapp* factor (8)). While the parties' sales efforts at that time were not directed to identical targets, there was evidence that they would likely clash in the future. For example, defendant, which had previously sold wire and cable made to European specifications for use in electrical components shipped to Europe, had begun to manufacture wire and cable that met U.S. specifications. The Third Circuit explained that "[t]his development considerably increase[d] the overlap in the parties' actual and potential customer pool." *Id.* at 464.

The Third Circuit also determined that plaintiff's ceramic insulators and defendant's wire and cable were closely related in function (*Lapp* factor (9)). Both were basic electrical components often used together. The Third Circuit concluded that customers would find it natural for the manufacturer of Lapp ceramic insulators and pole hardware to expand into wire and cable, and Lapp–Interpace introduced evidence it planned to do just that. The Third Circuit noted:

> The likelihood-of-expansion factor [*Lapp* factor (10)] is pivotal in non-competing products cases such as this. One of the chief reasons for granting a trademark owner protection in a market not his own is to protect his right someday to enter that market. When it appears extremely likely, as it does here, that the trademark owner will soon enter the defendant's field, this final factor weighs heavily in favor of injunctive relief.

*Id.* (citation omitted).

■ The Third Circuit has made it clear that the plaintiff does not have to prove actual confusion if the mark is registered and incontestable; "likelihood of confusion is all that need be shown." *Fisons*, 30 F.3d at 472 (citing *Ford Motor Co.*, 930 F.2d at 292 (internal citations omitted)). Where plaintiff's and defendant's products and services are not in direct competition, the court applies the ten *Lapp* factors. *Id.* at 475. In applying the *Lapp* factors, the court must weigh

each factor separately, however, not all ten factors must be weighed equally. *Id.* at 476. The Third Circuit has explained that "[t]he weight given to each factor in the overall picture, as well as its weighing for plaintiff or defendant, must be done on an individual fact-specific basis." *Id.* at 476 n. 11. Moreover, the court must treat each trademark infringement case as fact-specific; the court must, therefore, decide a case based on its unique own circumstances. *See Scott Paper*, 589 F.2d at 1231. In light of the Third Circuit's teachings, this court must apply the ten *Lapp* factors to the facts of the present case to determine if there is likelihood of confusion.

*Lapp Factor (1): The degree of similarity between the owner's trademark and the alleged infringing mark.*

██ The Third Circuit has explained that this factor is "[p]erhaps the most important" of the ten *Lapp* factors. *Fisons*, 30 F.3d at 476 (citing *Ford Motor Co.*, 930 F.2d 277, 293). The Third Circuit has held that "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Opticians Ass'n of America*, 920 F.2d at 195. To determine the degree of similarity of marks, the court should consider the "appearance, sound and meaning of the marks, as well as the manner in which the marks are used." *Accu Personnel v. AccuStaff, Inc.*, 823 F.Supp. 1161, 1164 (D.Del.1993) (citing *American Cyanamid Co. v. S.C. Johnson & Son, Inc.*, 729 F.Supp. 1018, 1021 (D.N.J.1989)).

As the Second Circuit has explained, "[t]rademarks, like small children, are not only seen but heard." *Grotrian v. Steinway & Sons*, 523 F.2d 1331 (2d Cir.1975). The court must consider the phonetic similarity when comparing the similarity of two marks. *See, e.g., Tefal, S.A. v. Products Intern. Co.*, 186 U.S.P.Q. 545 (D.N.J.1975), *aff'd*, 529 F.2d 495 (3d Cir.1976) (comparing "T–Fal" to "TEPAL"). With respect to phonetic similarity, the court finds that Maunder, Axiom's President and Chief Executive Officer, conceded that "Acxiom" and "Axiom" are pronounced the same and Axiom's expert witnesses Hoch and Borer agreed that the two names share the same pronunciation. Investors Lancaster and Pascoe were confused because the names sound identical. In televised programs, announcers pronounced the names identically. Thus, the court finds that the facts show that "Acxiom" and "Axiom" are pronounced identically.

"Acxiom" has an unusual spelling, by the deliberate insertion of a "c" into an ordinary English language noun. Axiom contends that the marks are easily distinguishable when written. The record establishes, however, that there is similarity between the marks even when the two names are written which leads to likelihood of confusion. For example, Matthew Vartabedian, technology editor of *Telemarketing & Call Center Solutions*, testified that he incorrectly used Acxiom's name in place of Axiom's name in a blurb he prepared for his magazine. Carolyn Boyles, a Southwestern Bell Wireless manager, testified that she thought Axiom was Acxiom based on her reading of an article in *Cellular Business* magazine. Cynthia Liesenfeld, systems manager of Robinson–Kurtin Communications, testified that in October 1997, she printed out an article from the Dow Jones headlines reporting a "stock price plunge" for "Axiom" and she thought this was a reference to Acxiom. Similarly, Sondra Kurtin, chief executive officer of Robinson–Kurtin Communications, testified about this same incident, explaining she read this same article which Liesenfeld had placed on her desk and mistakenly believed it referred to Acxiom.

The court finds that Axiom's mark is very similar to Acxiom's. The two marks are identical in sound and similar in appearance and manner of use. The court also notes they tend to convey the same meaning, "self-evident truth," particularly when pronounced. These factors contribute to the very similar overall impression created by the marks. Thus, *Lapp* factor (1), the similarity element, weighs heavily in favor of Acxiom because Axiom's mark is likely to cause confusion concerning the origin of Axiom's products and services.

*Lapp Factor (2): The strength of the owner's mark.*

██ The strength of the owner's mark is a measure of the mark's distinctiveness,

which is the mark's tendency to identify the products or services sold "under the mark as emanating from a particular, although possibly anonymous, source." *Accu Personnel,* 823 F.Supp. at 1165 (citing *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). Strong marks are generally accorded greater protection than weak marks. *See, e.g., id.* at 1164.

■ The court determines a mark's strength by weighing both the conceptual and commercial aspects of its strength. *See Rockland Mortg. Corp. v. Shareholders Funding, Inc.,* 835 F.Supp. 182, 193 (D.Del. 1993) (citation omitted). For the conceptual aspect, the court evaluates the mark's strength along a spectrum of distinctiveness from "nondistinctive" to "inherently distinctive." Within this distinctiveness spectrum, marks may be classified as (1) fanciful, (2) arbitrary, (3) suggestive, (4) descriptive, or (5) generic. *See, e.g., Accu Personnel,* 823 F.Supp. at 1165.

Fanciful marks are words that have been coined or invented for the sole purpose of functioning as trademarks. For example, "KODAK" is a fanciful mark. Arbitrary marks are words that enjoy common usage but are used in relationship to the product or service so as to "neither suggest nor describe any ingredient, quality or characteristic" of such product or service. *See id.* at 1165 (citing *Ford Motor Co.,* 930 F.2d at 292 n. 18 (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:4 (2d ed.1984))). Suggestive marks are similar to arbitrary marks, however, they "suggest a quality or ingredient" of the products or services. *See id.* (citations omitted). Descriptive marks describe the intended purpose, function, use, size or desirable characteristic of the products or services, the class of users of the products or services or the end effect upon the user. *See id.* (citations omitted). Finally, generic marks cannot be trade or service marks. *See id.* Generally, the closer a mark falls to the fanciful/arbitrary end of the distinctiveness spectrum, the stronger the mark is said to be. Fanciful, arbitrary and suggestive marks are termed "inherently distinctive." *See id.*

In its post-trial opening brief, Acxiom contends that its mark is arbitrary or fanciful. In its post-trial opening brief, Axiom contends that Acxiom's marks are suggestive. Thus, the parties would agree and the court finds that Acxiom's marks are "inherently distinctive."

■ With respect to the conceptual aspect, the court finds that classifying "ACXIOM" as a fanciful mark would be incorrect. Although "ACXIOM" may not be a defined word in the English language, it is not entirely invented and without reference to the English language as, for example, is the fanciful mark, "KODAK." *See, e.g., Eastman Kodak Co. v. Rakow,* 739 F.Supp. 116, 117 (W.D.N.Y.1989) (finding "KODAK" to be one of world's strongest marks); *Accu Personnel,* 823 F.Supp. at 1165. "ACXIOM" refers to the English language word, "axiom." Thus, the court concludes that "ACXIOM" is best classified as an arbitrary mark. Moreover, "ACXIOM" is best classified as an arbitrary mark because it is used in relationship to the product or service in a way that "neither suggest[s] nor describe[s] any ingredient, quality or characteristic" of such product or service.

With respect to the commercial aspect, the court examines the marketplace recognition enjoyed by the mark. *See Rockland Mortg. Corp.,* 835 F.Supp. at 193; *Accu Personnel,* 823 F.Supp. at 1165. The mark's marketplace recognition is determinable, in part, through trademark-related advertising and sales. *See Rockland Mortg. Corp.,* 835 F.Supp. at 193 (crediting plaintiff's trademark-related advertising and promotional expenditures of over $100,000 during five year period).

The court finds that Acxiom's sales revenues in 1997 were $402 million. Acxiom spent over $25 million on trademark-related advertising and promotions over the past two years and $50—60 million over the last eight to ten years. In 1997, Acxiom spent over $700,000 on magazine advertising. Acxiom also publishes its own promotional newsletter, hosts a web site and engages in other trademark-related promotional activities.

The court finds that both conceptually and commercially, Acxiom's marks enjoy strength. Thus, the strength of the owner's

mark, or *Lapp* factor (2), weighs heavily in Acxiom's favor.

*Lapp Factor (3): The price of the products or services and other factors indicative of the care and attention expected of consumers when making a purchase.*

The parties appear to agree and the court finds that both Acxiom and Axiom sell relatively expensive products and services to sophisticated and knowledgeable purchasers that typically involve relatively long sales cycles. Courts recognize that generally, these factors indicate that great care, effort and attention go into the purchase decision making which lessens likelihood of confusion. *See Fisons*, 30 F.3d at 476 n. 12; *see also Barnes Group Inc. v. Connell Limited Partnership*, 793 F.Supp. 1277, 1300 (D.Del.1992).

This "sophisticated purchaser" rationale generally weighs against the likelihood of confusion. Courts, however, may consider pre-sale and post-sale confusion when evaluating *Lapp* factor (3). *See, e.g., SecuraComm Consulting Inc.*, 984 F.Supp. at 298–99 (holding that pre-sale and post-sale are actionable). Consideration of pre-sale and post-sale confusion are appropriate since the Third Circuit teaches that courts must decide trademark infringement cases based on their own circumstances. *See generally Scott Paper*, 589 F.2d at 1231.

Pre-sale confusion, or initial interest confusion applies to situations where infringement is based on confusion that creates initial customer interest, even though no actual sale is completed as a result of the pre-sale confusion. *See SecuraComm Consulting Inc.*, 984 F.Supp. at 298–99 (citations omitted). "For example, the likelihood that a potential purchaser of a specialized computer program may be drawn to the junior user [of a mark] thinking it was the senior user, is actionable 'confusion'" even though the purchaser's confusion is eventually dissipated over the course of the purchase decision-making process. *Id.* at 298 (citing 3 McCarthy, *supra.*, § 23:6 (4th ed.1997) (other citations omitted)).

Under post-sale confusion, the senior user's potential purchasers or ongoing customers might mistakenly associate the inferi-or quality work of the junior user with the senior user and, therefore, refuse to deal with the senior user in the future. *See id.* at 299. The Third Circuit has not yet directly addressed post-sale confusion with respect to *Lapp* factor 3, however many courts recognize post-sale confusion. *Id.* (citing *Payless Shoesource, Inc. v. Reebok International Ltd.*, 998 F.2d 985, 989 (Fed.Cir.1993)) (applying 10th Circuit law; citing support from the 1st, 2d, 4th, 5th, 9th and 11th Circuits).

The court finds that there is a likelihood of pre-sale confusion because of various marketing activities that Acxiom and Axiom regularly use. Marketing activities such as cold calls from sales representatives to potential purchasers, participation at industry trade shows and conferences and references in trade publications and other media all contribute to a realistic situation where a sophisticated purchaser will mistakenly associate Axiom for Acxiom. For example, Hershberger and Boyle, both telecommunications employees, testified that if they received a telephone call from someone who said he was from Axiom, they would assume the caller was referring to Acxiom. Through this pre-sale confusion, Axiom gains a marketing advantage in the form of a foot in the door, which Johns discussed in his expert witness testimony.

The court finds that Acxiom has not shown that there is a likelihood of post-sale confusion between products and services of the two companies. Johns testified how injury to Acxiom's reputation can result if negative comments made about Axiom are mistakenly attributed to Acxiom. The court notes, however, that aside from this limited expert witness testimony, Acxiom has presented no evidence showing such a likelihood of post-sale confusion. In particular, Acxiom has not shown that Axiom performs inferior quality work or has a negative reputation in any way.

The court finds that *Lapp* factor (3), the price of the products or services and other factors indicative of the care and attention expected of consumers when making a purchase, do not favor either party. While the "sophisticated purchaser" rationale generally weighs against the likelihood of confusion,

Acxiom has shown that there is a likelihood of pre-sale confusion because of various similar marketing activities.

*Lapp Factor (4): The length of time defendant has used the mark without evidence of actual confusion arising.*

In its opening post-trial brief, Axiom contends that in the decade Acxiom has used the "Acxiom" name, there has been no confusion with any of the other "Axiom" marks. As support for its contention, Axiom cites to a district court case. *Safeguard Bus. Systems Inc. v. New England Bus. Systems, Inc.*, 696 F.Supp. 1041, 1045 (E.D.Pa.1988) (holding trademark "FAST FORM" for business forms was not infringed by mark "FAST-FORM" for computer software). In *Safeguard*, the district court found plaintiff's "FAST FORM" mark for business forms had not been confused with "FASFORM," a mark belonging to a third party, which used "FASFORM" to make computer generated labels, badges, signs and similar products. The court determined that because the "FASFORM" mark for computer generated material had not been confused with plaintiff's "FAST FORM" mark suggested that plaintiff's mark would not be confused with defendant's "FAST FORM" mark for computer software. *Id.* at 1045.

The court finds that the facts of *Safeguard* and the court's specific findings with respect to *Lapp* factor (4) may be distinguished from the present case. The *Safeguard* court found that "FASFORM," the third party mark for computer generated material, had not been confused with plaintiff's "FAST FORM" mark for business forms. Defendant's "FASTFORM" mark was used for computer software which the court reasoned was closely related to use of "FASFORM" for computer generated material. Here, Axiom has not made any convincing showing that any other "Axiom" mark shared such a close relationship with Acxiom. Thus the court finds this lack of showing diminishes Axiom's contention.

The court finds that in the seven months between Axiom's adoption of its name and the trial in this case, there has been evidence of actual customer confusion between Acxiom's and Axiom's products and services as discussed in *Lapp* factor (6) below. Thus, since there has been evidence of confusion, *Lapp* factor (4), or the length of time the defendant has used the mark without evidence of actual confusion arising, weighs against Axiom and in favor of Acxiom.

*Lapp Factor (5): Defendant's intent in adopting the mark.*

The Third Circuit has held that adopting a mark to take advantage of the good will or reputation of the senior user of the mark is probative of likelihood of confusion. *See Scott Paper*, 589 F.2d at 1230. In its post-trial opening brief, Acxiom alleges that Axiom engaged in such wrongful adoption, contending that Axiom knew of Acxiom's prior use of the mark and that the court can infer willfulness when Axiom, the junior user, adopts the contested mark with knowledge of senior user Acxiom's use. As support, Acxiom cites to a federal district court case, *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108 (S.D.N.Y.1981), and the McCarthy treatise.

In *Dreyfus*, the district court explained that the defendant's "awareness from the outset of the similarity of the two [advertising] campaigns is significant," noting "[p]roof of such knowledge 'has often been relied upon as evidence of bad faith and an intention to trade upon another's good will. A wrongful intent appears easy to infer where the defendant knew of the plaintiff's mark, had freedom to choose any mark, and 'just happened' to choose a mark confusingly similar to plaintiff's mark.'" *Dreyfus*, 525 F.Supp. at 1121 (quoting 2 McCarthy, *supra*. § 23:33). The *Dreyfus* court continued, "Where we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into a defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well known mark." *Id.* at 1121(citation omitted).

In *Dreyfus*, however, the district court conducted a fact intensive analysis to reach its decision preliminarily enjoining the defendant from using lions such as those used by plaintiff. *Id.* at 1125. Specifically, the district court determined that prior to November 1980, the defendant "had never used a

realistic lion in its advertising, only an heraldic lion logo, dissimilar to plaintiff's marks." *Id.* at 1120. Moreover, despite defendant's explanation, the district court found it "difficult to believe" that the paintings of lions adopted and used by defendant "were not copied from the [plaintiff's] lions." *Id.* The district court found it "extremely unlikely that the [defendant's] advertising agency just happened on the idea of placing the lion in contexts that related to the [defendant's] work, or on the idea of using a family of lions to represent different [defendant's] functions, or on the theme of lions being king of the 'money jungle.'" *Id.* To the district court, "[t]hese features strongly suggest an attempt to copy [plaintiff's] advertising strategy, and thereby to capitalize on [plaintiff's] reputation and popularity through conscious or unconscious association among consumers." *Id.*

In applying this same fact intensive analysis to the present case, the court notes that in choosing the "Axiom" name in 1997, Axiom undertook a process where it considered several names with similar conceptual qualities. For example, Gooen, the business communications analyst, testified in her deposition that she was hired to come up with new names for the corporation. Gooen testified she received input from Axiom's senior executives Farina and Morrow, explaining that Farina wanted a one word, English language name that was not a made-up name. Gooen testified she used reference materials to come up with appropriate options.

While the parties do not dispute that Axiom relied on advice of outside counsel at the time of adoption of its mark, Acxiom contends that the appropriate inquiry for the court is whether Axiom acted carelessly in its investigation of Acxiom's marks. The Third Circuit has explained that the court's inquiry in such cases involves determining whether the defendant "was careless in not conducting a thorough name search for American uses of the name." *Fisons*, 30 F.3d at 480 (quoting *Lapp*, 721 F.2d at 463). In *Fisons*, the Third Circuit suggested courts consider such questions as the adequacy of the name search, the follow-through on the investigation, and the evaluation of likelihood of confusion. *Id.* at 480.

In the present case, the facts show that Axiom used experienced counsel from an established law firm to determine if it could register the "AXIOM" mark. In his deposition, Zielinski testified regarding the specific steps he undertook. Zielinski testified that he concluded that Acxiom's registrations did not pose a legal obstacle. While Acxiom contends that Axiom did not provide information in the form of some advertisements to Zielinski, Zielinski testified that he discussed registration issue with Axiom senior executives Maunder and Morrow. He also testified that marketing materials subsequently shown to him during his depositions would not have affected his conclusions. In sum, the court finds that the facts do not suggest that Zielinski and his law firm were careless in the legal work they performed for Axiom. The court also notes that Acxiom does not allege nor does it prove that Axiom intended to usurp Acxiom's name and goodwill by adopting the "AXIOM" mark. Therefore, with respect to the defendant's intent in adopting the mark, or *Lapp* factor (5), the court finds that the actions taken by Axiom do not equate to actions taken by a party proceeding in bad faith by adopting the "AXIOM" mark. Accordingly, the court finds *Lapp* factor (5) weighs in favor of Axiom.

*Lapp Factor (6): Evidence of actual confusion.*

In its post-trial opening brief, Axiom contends: (1) Acxiom has failed to cite any incidents of confusion involving actual or potential product purchasers; (2) Acxiom's evidence is too insubstantial to support a likelihood of confusion; (3) any "confusion" was quickly remedied; and (4) "[m]ost of the incidents [of 'confusion'] involved careless errors or a misunderstanding." In its post-trial opening brief, Acxiom contends: (1) very little proof of actual confusion suffices to prove likelihood of confusion and (2) "a number of customers, investors and reporters have been confused."

The court finds Acxiom has shown there were incidents of confusion as summarized below:

(1) Matthew Vartabedian, technology editor of *Telemarketing & Call Center Solutions* magazine, testified in his deposition that he

incorrectly used Acxiom's name in place of Axiom's name in a "blurb" he prepared for his magazine's "People" column in the November 1997 edition. According to Vartabedian's testimony, when he saw Axiom's press release announcing the Maunder appointment, he "just misidentified the company involved and wrote it as 'Acxiom.'" Vartabedian testified he also thought of Acxiom when he read the phrase, "data collection," in Axiom's press release. The court finds Vartabedian confused Axiom for Acxiom.

(2) Sondra Kurtin, chief executive officer of Robinson–Kurtin Communications and Cynthia Liesenfeld, a Robinson–Kurtin Communications employee, testified in their depositions regarding another incident of confusion. Liesenfeld testified that in October 1997, while at work, she printed out an article from the Dow Jones headlines reporting a "stock price plunge" for "Axiom." She testified she was confused because she thought this was a reference to Acxiom " because of the name and the description of what the company did." Liesenfeld told Kurtin and gave her a copy of the article. Thinking the article referred to Acxiom and concerned about the stock price plunge, Kurtin announced it over the office intercom. The court finds Liesenfeld and Kurtin confused Axiom for Acxiom.

(3) Steve Lahodny, Acxiom's sales associate, testified that while attending the "Supercomm" trade show in June 1997, he saw Axiom's booth and had the "impression" that it "was probably an international organization of Plaintiff Acxiom." He testified he "really didn't know" if it was affiliated with Acxiom but "suspected it could be." The court finds Lahodny really did not know whether he was confused between Axiom and Acxiom.

(4) George Anderson, an Amdahl Corporation executive, testified that on about October 20, 1997, he learned Acxiom had a demographic database of possible interest to his company and he obtained Lahodny's name and telephone number. Before speaking with Lahodny, he attended the "NCF '97 Infovision" trade show in Chicago where he saw a woman wearing an Axiom badge. During a telephone call that same day, he mistakenly told Lahodny that "Acxiom" was at the trade show in Chicago and asked Lahodny if he would attend. The court finds Anderson confused Axiom for Acxiom.

(5) Carolyn Boyles, a Southwestern Bell Wireless manager, testified that she thought Axiom was Acxiom based on her reading of an article in *Cellular Business* magazine. The article mentioned "data collection solutions" which to her was "what [Acxiom] did as its business" and discussed "telecommunications providers" with whom she knew Acxiom had "relationships." The court finds Boyles confused Axiom for Acxiom.

(6) Two Acxiom investors, Brian Lancaster and Phillip Pascoe, and a potential investor, Thomas Ross, gave deposition testimony concerning incidents of confusion. Lancaster testified that in October 1997, he saw a televised *Nightly Business Report* which mistakenly reported that Acxiom's stock price declined when, in fact, Axiom's stock price had declined. After an hour of researching and "agonizing," he realized the mistake. He testified he was "close" to selling the stock and he called Acxiom the next day to confirm the mistake. The court finds Lancaster confused Acxiom for Axiom.

(7) Pascoe, a registered stockbroker and professional investor, testified that in early October 1997, he heard CNNFN's "Stock To Watch" program announce that Acxiom had suffered a shortfall in earnings. In fact, Axiom had suffered a shortfall in earnings. Later that morning, "as soon as time would allow," he telephoned his son, an Acxiom employee, to "get some clarification" and to assure himself that this was a different company. The court finds Pascoe confused Acxiom for Axiom.

(8) Ross, an investor, testified that on October 9, 1997, while he watched CNBC, he heard a reporter announce that Axiom stock had dropped 40%. The reporter described Axiom as "a computer hardware and software company." Ross, who did not know how Acxiom spelled its name at the time he watched this CNBC broadcast, "was very sure and very certain" that Acxiom's stock dropped. The next morning, he checked the local newspaper for an article explaining the

drop, but he did not find anything. He then checked the listed stock prices in the newspaper, saw Axiom in the listings and realized his mistake. The court finds Ross confused Acxiom for Axiom.

As for Axiom's four contentions that (1) Acxiom has failed to cite any incidents of confusion involving product purchasers; (2) Acxiom's evidence is too insubstantial to support a likelihood of confusion; (3) any confusion was quickly remedied; and (4) most of the incidents involved careless errors or a misunderstanding, the court finds the following: With respect to (1), Amdahl's Anderson is in fact a potential product purchaser; he testified he wanted to call Acxiom's sales representative to learn more about an Acxiom database. Thus, Acxiom cited at least one incident of confusion involving actual or potential product purchasers. With respect to (2), the Third Circuit has noted that "very little proof of actual confusion would be necessary to prove the likelihood of confusion." *Country Floors, Inc. v. Partnership Composed of Gepner and Ford,* 930 F.2d 1056, 1063 (3d Cir.1991) (citing *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971)). Thus, the court finds that Acxiom's evidence, as summarized above, is more than "very little proof" and thus supports a likelihood of confusion. With respect to (3), while several incidents of confusion were remedied within less than an hour, not all of them were so quickly remedied. For example, Vartabedian's confusion resulted in a mistake that appeared in a magazine. With respect to (4), the court finds that while at least Lahodny's testimony about confusion appears to be the product of his harmless misunderstanding, most of the incidents did not involve careless errors or misunderstanding. For example, the court does not find that the facts show that the confusion experienced by Vartabedian, Kurtin, Liesenfeld, Anderson, Boyles, Lancaster, Pascoe and Ross resulted from carelessness.

The court finds that the facts show that there is evidence of actual confusion between the "Acxiom" and "Axiom" marks. Therefore, *Lapp* factor (6) weighs in favor of Acxiom.

*Whether investor confusion may be considered by the court.*

In its application of the *Lapp* factors to this case, the court has considered evidence of investor confusion as relevant to the fact intensive examination required by the Third Circuit's teachings. In its application of *Lapp* factor (6), the court considered the testimony of investors Lancaster, Pascoe and Ross. Axiom contends that trademark protection is limited to actual or potential purchasers and that non-purchaser confusion is thus irrelevant. Accordingly, Axiom contends that any such evidence related to investor confusion should not be considered by the court as part of its *Lapp* factors analysis.

The court notes that the text of Section 32(1) of the Lanham Act prohibits the non-consensual use of a registered trademark if such use "is likely to cause confusion, or to cause mistake, or to deceive, . . ." 15 U.S.C. § 1114(1). Axiom does not cite and the court cannot find language in the relevant text that limits the statute's applicability to confusion among purchasers. This text of Section 32(1) is significant because this infringement section of the Lanham Act, prior to 1962, required that there be likelihood of confusion of "purchasers as to the source of origin of such goods or services." In 1962, Congress deleted this language and amended this section to reflect its current wording. As other courts have concluded, this action shows a clear congressional intent to "outlaw the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely of purchasers nor simply as to source of origin." *See Koppers Co. v. Krupp–Koppers GmbH,* 517 F.Supp. 836, 843–45 (W.D.Pa.1981) (citing *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566, 568 (2d Cir.1971)). Similarly, courts have found that non-purchasers are entitled to the protection of the Lanham Act and at least one district court in the Third Circuit has decided that investor confusion is within the ambit of federal trademark law. *See Koppers Co.,* 517 F.Supp. at 843–45. Thus, this court finds that investor confusion may be considered by the trial court as part of its application of the *Lapp* factors.

*Lapp Factor (7): Whether the products or services, though not competing, are marketed through the same channels of trade and advertised in the same media.*

As courts have noted, the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion. *See, e.g., Estate of Presley v. Russen,* 513 F.Supp. 1339, 1369 (D.N.J.1981) (citation omitted). In examining marketing and advertising, courts can consider whether the parties market in national consumer magazines, trade publications and other media. *See A & H Sportswear Co. v. Victoria's Secret Stores,* 926 F.Supp. 1233, 1262 (E.D.Pa.1996). With respect to *Lapp* factor (7), Axiom contends in its post-trial opening brief that where "the parties sell to different departments, the likelihood of confusion is remote." Here, Axiom apparently contends that sales to different departments involve different channels of trade. Axiom also contends that "there is no evidence that the parties advertise in the same media." The court finds two major problems with Axiom's contentions. First, by contending that sales to different departments involve different channels, Axiom has merely asserted a conclusion. However, *Lapp* factor (7) requires a fact-intensive analysis of whether the products and services of the trademark owner and alleged infringer are marketed through the same channels of trade and advertised in the same media. Secondly, by contending that "there is no evidence that the parties advertise in the same media," Axiom has attempted to incorrectly narrow the scope of the court's *Lapp* factor (7) analysis.

The court finds that both Acxiom and Axiom use sales forces that routinely make cold calls to potential customers as an integral part of their marketing efforts. Acxiom and Axiom also share business or channel partners that serve as additional conduits to the market. Acxiom and Axiom use print advertising and their names have appeared in the same trade publications; on at least one occasion, the Acxiom and Axiom names appeared in the same publication. Acxiom and Axiom representatives attend industry trade shows to promote their marks. Acxiom and Axiom both have web pages on the Internet.

Accordingly, the court concludes that the parties' products and services are marketed through the same channels of trade and advertised in the same media. Thus, *Lapp* factor (7) weighs in favor of Acxiom.

*Lapp Factor (8): The extent to which targets of the parties' sales efforts are the same.*

The Third Circuit has explained that likelihood of confusion increases if the targets of the parties' sales efforts are the same or are likely to be the same in the future. *Lapp,* 721 F.2d at 463–64. In its post-trial opening brief, Axiom contends that customer overlap does not exist where parties sell to different departments in a corporation. The court notes that Axiom's President and Chief Executive Officer Maunder testified at trial that there is currently overlap in the customer base of Acxiom and Axiom. The facts show that both Acxiom and Axiom market their respective products and services to telecommunications industry customers. Acxiom and Axiom share current or potential customers including the regional Bell operating companies, long distance carriers, local phone companies and wireless carriers.

Maunder also testified that the decision makers for Axiom's products and services include information technology managers, network managers, systems engineering personnel, procurement personnel and senior management. He also testified he is encouraging his sales personnel to expand their scope of contacts to include marketing and customer care personnel in telecommunications companies. The decision makers for Acxiom's products and services include directors of database management, senior management, marketing personnel and customer care personnel, according to Acxiom's Drake's testimony. Acxiom's Terry's testified that Acxiom targets information technology and business executives through its partnership with *CIO* Magazine.

The court also notes that Axiom representatives have attended industry trade shows that have targeted corporate officials responsible for marketing and customer care. For example, Axiom exhibited at "Billing '97," a trade show where Axiom's Morrow appeared on a "Data Warehousing" panel. In describing who should attend, the event's pro-

motional brochure stated, "This is the event for you, if you are involved in maximizing the potential of your Information Systems and Processes in any of the following areas: Customer Acquisition, Retention and Loyalty, Marketing ... Data Warehousing."

Given the evidence presented, the court finds the extent to which targets of the parties' sales efforts are the same, or *Lapp* factor (8), weighs heavily in Acxiom's favor.

*Lapp Factor (9): The relationship of the products or services in the minds of consumers because of the similarity of function.*

■ In *Lapp*, the Third Circuit found trademark infringement where the parties' products and services were not competing but were related enough so that even a sophisticated consumer "would find it natural or likely" that plaintiff would expand into defendant's products and services. *Lapp*, 721 F.2d at 464. *Lapp* teaches that in evaluating likelihood of confusion, the court must examine whether the parties' products and services are sufficiently related so that a consumer would find it natural or likely that one party would offer products or services associated with the other. *Id.* at 463–64; *see Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341, 1362–63 (E.D.Pa.1972) *aff'd*, 480 F.2d 917, (3d Cir.1973) (holding that the relationship between plaintiff's bar accessories, cigars and pipes and defendant's scotch whiskey is close and therefore parties' products are related products, although physically dissimilar and non-competing).

In its post-trial opening brief, Axiom contends that Acxiom's argument is that the parties' products and services are related because data transmitted by Axiom's products may be used by Acxiom in a marketing database. Axiom asserts this is a "tangential conclusion, which doesn't even exist presently, [and] is insufficient to demonstrate relatedness." In its post-trial reply brief, Axiom contends that the "notion" that Axiom "is expanding into data applications is unfounded" and that Maunder's hope that the Axiom name becomes better known among phone company executives "does not mean an increased possibility of confusion."

The court finds the facts show that Axiom offers integrated computer hardware and software systems to collect and process CDRs. Corporations, including telecommunications companies, increasingly use data captured by CDRs for various applications in which Acxiom is very much involved. These applications include marketing databases, data warehousing, customer profiling and decision support systems. As Axiom's Maunder testified, "[O]ne can see how the call detail records that [Axiom] collect[s] and distribute could be used by [Acxiom] in data warehouse or marketing databases ...." Acxiom's Drake testified that Acxiom has built marketing databases for telecommunications companies such as Ameritech, Bell Atlantic, Bell South and GTE. In building these marketing databases, Acxiom worked on external data as well as internal data such as data from the company's billing system, customer care department and other departments.

The court finds the facts show that the telecommunications industry intends to make increasing use of transaction data for various applications such as marketing and data warehousing. According to Maunder's testimony, Axiom encourages telecommunications companies to make greater use of transaction data for marketing purposes and he wants his customers to "know that we fit into an environment which is more to do with data management transaction data ...."

With respect to Axiom's contentions as detailed above, the court finds Axiom's characterization of Acxiom's argument—that the parties' products and services are related because data Axiom's products transmit may be used by Acxiom in a marketing database—is less than complete. Acxiom has offered convincing evidence that the parties offer related products and services for the telecommunications industry and that they promote them in ways that highlight their close relationship.

Axiom contends that the "notion" that Axiom "is expanding into data applications is unfounded." This argument, however, is less than complete because the analysis for *Lapp* factor (9) does not focus on whether the parties deal with directly competing products

and services. The court's focus is on whether the parties' products and services are sufficiently related so that a consumer would find it natural or likely that one party would offer products or services associated with the other.

Axiom's contention that Maunder's hope that the Axiom name becomes better known among phone company executives "does not mean an increased possibility of confusion" is also less than complete because to the extent that Axiom associates itself with marketing and other applications, a consumer would find it natural or likely that one party would offer products or services associated with the other.

The court finds that the relationship of the products and services in the minds of consumers because of the similarity of function is close, thus *Lapp* factor (9) weighs in favor of Acxiom.

*Lapp Factor (10): Other facts suggesting that the consuming public might expect the prior owner to manufacture a product or provide a service in the defendant's market, or that he is likely to expand into that market.*

The Third Circuit has explained that the likelihood-of-expansion factor, or *Lapp* factor (10), is "pivotal" in cases involving non-competing products, noting "[w]hen it appears extremely likely . . . that the trademark owner will soon enter the defendant's field, this final factor weighs heavily in favor of injunctive relief." *Lapp,* 721 F.2d at 464.

In its post-trial opening brief, Acxiom contends that Acxiom intends to expand its telecommunications-related business in general and its work with call usage data in particular. In this regard, Acxiom asserts it has identified management of CDR data as one of its areas of future growth. Acxiom further contends that Axiom intends to expand into Acxiom's traditional areas and to pursue product development plans to establish links for a customer database. In sum, Acxiom contends that with respect to the telecommunications industry, Acxiom intends to move closer to the switch while Axiom intends to move farther away from the switch.

Citing product line differences, Axiom contends that it is not moving toward marketing, database or customer care applications and that Acxiom's claim that it is moving toward manipulating CDRs is not sufficiently convergent, explaining that the products Axiom is developing do not involve CDRs.

As discussed in the "Ameritech Project" section above, the Ameritech project demonstrates Acxiom's current movement toward call usage data and CDRs. According to Ameritech's Hershberger's testimony, Ameritech is considering working with Acxiom on a project involving transaction data processing but confirmed that no final decision has been made; it is a "test of a concept." Specifically, Hershberger wants Ameritech to do "smash invector" work on Ameritech's CUTS data. Hershberger and Acxiom's Kraus testified that before CDRs go to Acxiom, they run through several processes; thus Acxiom does not work on raw CDRs. Acxiom's Drake and other witnesses testified that Ameritech and Acxiom have not yet come to any financial arrangement for this project and have not entered into a contract or any kind of agreement at this time.

The court find that the facts show that the Ameritech project is, as Hershberger described, a "test of a concept," particularly since no agreement of any kind has been entered. Nonetheless, *Lapp* factor (10) only requires a showing that the consuming public might expect the prior owner to manufacture a product or provide a service in the defendant's market, or that the prior owner is likely to expand into that market. The court finds that the "test of a concept" which Acxiom has shown, establishes Acxiom's movement toward the switch and thus closer to Axiom's products and services. However, "test of a concept" does not satisfy *Lapp* factor (10) because a "test of a concept" requires the court to engage in too much speculation from the perspective of actual project success. Moreover, if the court were to permit the standard to become "test of a concept," the court would create an incentive for parties to devise litigation-induced "projects" or corporate paper exercises done for the sole purpose of meeting the "test of a concept" standard.

The court finds that Acxiom has not convincingly demonstrated that Axiom intends to expand into Acxiom's traditional areas. Axiom has not moved toward marketing, database or customer care applications to the extent that *Lapp* factor (10) is implicated. Thus, the court concludes that *Lapp* factor 10 weighs in favor of Axiom.

*Summary of the ten Lapp factors.*

The Third Circuit has termed *Lapp* factor (1), the degree of similarity between the owner's trademark and the alleged infringing mark, as "perhaps the most important" of the ten factors. In the context of this case, the court agrees and assesses it great importance. Lapp factor (1) weighs heavily in Acxiom's favor. Similarly, *Lapp* factor (2), the strength of the owner's mark, and *Lapp* factor (8), the extent to which targets of the parties' sales efforts are the same, also weigh heavily in Acxiom's favor.

*Lapp* factor (4), the length of time defendant has used the mark without evidence of actual confusion arising, *Lapp* factor (6), evidence of actual confusion, *Lapp* factor (7), whether the products or services, though not competing, are marketed through the same channels of trade and advertised in the same media and *Lapp* factor (9), the relationship of the products or services in the minds of consumers because of the similarity of function, all weigh in Acxiom's favor.

Only *Lapp* factor (5), defendant's intent in adopting the mark, and *Lapp* factor (10), other facts suggesting that the consuming public might expect the prior owner to manufacture a product or provide a service in the defendant's market, or that he is likely to expand into that market, weigh in Axiom's favor. And *Lapp* factor (3), the price of the products or services and other factors indicative of the care and attention expected of consumers when making a purchase, does not favor either party.

Overall, the court finds that the *Lapp* factors decisively favor Acxiom. Thus, the court concludes there is likelihood of confusion. The court finds Acxiom has proven the third element required for trademark infringement, specifically Axiom's use of the mark is likely to create confusion concerning the origin of the products or services.

B. *What is the Appropriate Remedy?*

Having found that Axiom is engaging in infringement of registered trademarks and service marks under § 43(a) of the Lanham Act, 15 U.S.C. § 1114, the court must now fashion the proper remedy for this infringement. The Lanham Act provides for injunctive relief, noting in relevant part, that the courts "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . ." 15 U.S.C. § 1116(a). As the Third Circuit has explained, "Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief." *Lapp,* 721 F.2d at 462. In trademark infringement actions, prevention of likelihood of confusion determines the appropriate scope of injunctive relief. *See, e.g., A & H Sportswear Co., Inc.,* 967 F.Supp. at 1457 (citations omitted). Acxiom has requested: (1) a permanent injunction enjoining Axiom from making any further use of "AXIOM" as a business name, or part of a business name, trademark, service mark or other similar designation, pursuant to 15 U.S.C. § 1116(a); (2) an order requiring Axiom to abandon and withdraw its application to register "AXIOM" as a trademark or service mark; and (3) an order requiring Axiom to produce for destruction all advertising, packaging, promotional materials and other like things in its possession or control that bear the "AXIOM" name, pursuant to 15 U.S.C. § 1118. The court agrees and finds that these three measures are necessary to prevent likelihood of confusion.

Acxiom also requests attorneys' fees, pursuant to 15 U.S.C. § 1117(a), which provides that a court "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Third Circuit has explained that a court must find "culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement," for a case to qualify as "exceptional." *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 47 (3d

Cir.1991). The Third Circuit has construed "exceptional" cases narrowly, noting that "[t]ypically, attorneys' fee cases involve deliberate attempts by the defendant to pass off its goods as those of the plaintiff by applying plaintiff's trademark to defendant's goods," and adopting as a "reasoned exposition of what constitutes an exceptional case" the position that "bad faith intentionally must be shown for a case to qualify as exceptional; it must be demonstrated that the 'defendant intended to pass off' goods he was selling as those manufactured by the plaintiff, and '[a] strong showing would seem [to be] required to warrant a finding of intentionality.'" *Id.* at 47–49 (citations omitted). For the same reasons the court explained in its *Lapp* factor (5) analysis above, the court finds that with respect to attorneys' fees the actions taken by Axiom do not equate to actions taken by a party proceeding in bad faith in adopting the its mark. Thus, the court does not find this case an exceptional one as required for award of attorneys' fees under 15 U.S.C. § 1117(a).

Acxiom seeks to recover Axiom's profits, pursuant to 15 U.S.C. § 1117(a). Acxiom requests profits in the amount of $1.2 million which it bases on Axiom's net income after taxes earned after the adoption of the infringing name. The court, however, does not automatically award profits but only grants them in light of equitable considerations. 15 U.S.C. § 1117(a). For example, the Third Circuit has held that profits will be denied where an injunction forbidding future infringing acts satisfies the equities of the case. *See Microsoft Corp. v. CMOS Technologies, Inc.,* 872 F.Supp. 1329, 1336–37 (D.N.J. 1994) (citations omitted). The Supreme Court has held that profits and damages may be awarded in cases where the infringement is "willfully calculated to exploit the advantage of an established mark." *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 131, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947). The Third Circuit has explained that "the propriety of an accounting depends upon whether [the infringer's] use was in good faith and whether it was palming off." *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1407 (3d Cir.), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257

(1985). Without any showing of fraudulent conduct, palming off or deliberate intent to confuse by the infringer, the court should not award profits. *See Microsoft Corp.,* 872 F.Supp. at 1337. The court may also consider whether there is evidence of pecuniary harm suffered by the owner of the marks. *See, e.g., Alfred Dunhill of London, Inc.,* 350 F.Supp. at 1369.

In this case, the court finds Acxiom has not established that Axiom engaged in fraudulent conduct, palming off or any deliberate intent to confuse. The court finds nothing in the record to show there was pecuniary harm to Acxiom or any deliberate intent on the part of Axiom to deceive the public. Moreover, the court believes the permanent injunction forbidding future infringements that it will issue along with related measures in the order accompanying this opinion fully satisfies the equities of this case. Accordingly, just as it does not award any reasonable attorneys' fees, the court does not award any profits to Acxiom.

C.  *The Court's Treatment of Acxiom's Other Lanham Act, State Law and Common-law Claims.*

In addition to its claim that Axiom is engaging in infringement of registered trademarks and service marks under § 43(a) of the Lanham Act, Acxiom also contends that Axiom is engaging in false designation of origin under § 43(a) of the Lanham Act; dilution under the Federal Trademark Dilution Act of 1995, § 43(c) of the Lanham Act; unfair competition under Delaware's Deceptive Trade Practices Act; and common-law trademark, service mark and trade name infringement.

The court finds that it is not necessary to determine whether Axiom's actions infringing Acxiom's marks also violate other Lanham Act provisions, Delaware state law or the common-law. These related laws are similar to trademark infringement laws in their scope and provide similar remedies. For example, remedies for dilution of famous marks provide that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the

court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name ..." 15 U.S.C. § 1125(c). Similarly, Delaware's Deceptive Trade Practices Act provides that "a person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable." 6 Del. C. §§ 2533(a). As discussed above, based on trademark infringement, the court finds that Acxiom is entitled to injunctive relief and the court will be issuing an order to that effect. Therefore, it is not necessary to reach these other legal claims. *See generally Weight Watchers Intern., Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1283 (S.D.N.Y.1990). Accordingly, the court makes no findings as to whether Acxiom has satisfied any of the substantive and procedural requirements under its other Lanham Act, Delaware state law or common-law claims.

III. *CONCLUSION*

For the reasons stated above, the court grants judgment in favor of Plaintiff Acxiom and against Defendant Axiom on Acxiom's claim of infringement of registered trademarks and service marks under § 43(a) of the Lanham Act, 15 U.S.C. § 1114.

The court will enter an order in accordance with this opinion.